**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**REXANNA KAY SHUMAKER,**

     **Plaintiff,**

**vs.**                       **CIVIL ACTION NO. 3:20-CV-00331**

**ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered May 11, 2020 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Memorandum in Support of Plaintiff's Motion for Judgment o[n] the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 17, 18)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for entry of an award for benefits or for remand (ECF No. 17); **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 18); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

## Procedural History

1

The Plaintiff, Rexanna Kay Shumaker, (hereinafter referred to as "Claimant"), protectively filed her application for benefits on April 10, 2017 (Tr. at 174-175) alleging disability since December 16, 2015[1] because of "right shoulder deterioration, left shoulder brachial nerve and artery impingement, carpal tunnel in both hands, arthritis in shoulders, neck, back, hips and both legs, deterioration of L3-L4, femur broken twice, knee cap shattered twice and cap replaced, knee replacement, right leg been broken 6 times, right ankle broken set wrong and healed in deformity, dysbiosis, and high cholesterol" (Tr. at 219). Her claim was initially denied on July 6, 2017 (Tr. at 68-78) and again upon reconsideration on August 28, 2017 (Tr. at 80-90). Thereafter, Claimant filed a written request for hearing on October 3, 2017 (Tr. at 117-118, 119).

An administrative hearing was held on January 24, 2019 before the Honorable Neil Morholt, Administrative Law Judge ("ALJ"). (Tr. at 33-67) On February 22, 2019, the ALJ entered an unfavorable decision. (Tr. at 13-31) On April 2, 2019, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 171-173) The ALJ's decision became the final decision of the Commissioner on April 3, 2020 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-7)

On May 8, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11) Subsequently, Claimant filed a Memorandum in Support of Plaintiff's Motion for Judgment o[n] the Pleadings (ECF No. 17), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 18). Consequently, this matter is fully

---

[1] On January 24, 2019, Claimant amended her alleged onset date to the date she retired (Tr. at 16, 193).

briefed and ready for resolution.

**Claimant's Background**

Claimant was 65 years old as of the amended alleged onset date and defined as a person "closely approaching retirement age" throughout the underlying proceedings. See 20 C.F.R. § 404.1563(e). (Tr. at 39, 68) Claimant has a Bachelor's degree in general education and a Master's degree in mental health counseling. (Tr. at 38) Claimant last worked in December 2015 as a vocational rehabilitation counselor, interviewing clients and determining their disabilities in order to get estimates of costs on modifications for their vehicles or their homes. (Tr. at 42, 57) Since she retired, Claimant did some "contract work" at Marshall University with the medical school as a simulated patient in 2016 and 2017. (Tr. at 41)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims, 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id.

§ 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

**Summary of ALJ's Decision**

In this case, the ALJ found Claimant met the insured status requirements through September 30, 2016. (Tr. at 18, Finding No. 1) At the first step, the ALJ determined that Claimant had not engaged in substantial gainful activity since the amended alleged onset date of December 16, 2015 through her date last insured ("DLI"). (Id., Finding No. 2) At the second inquiry, the ALJ found that Claimant had the following severe impairments: degenerative joint and disc disease; right knee total knee replacement; and right shoulder arthrosis. (Id., Finding No. 3) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 20, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform sedentary work except she could:

stand and/or walk four hours; occasionally balance, stoop, kneel, crouch, and crawl; occasionally reach overhead with the right upper extremity; frequently reach in all other directions with the right upper extremity; and should avoid frequent exposure to extreme cold, dust, odors, fumes, gases, other pulmonary irritants, vibration, unprotected heights, and moving mechanical parts.

(Id., Finding No. 5) At step four, the ALJ found Claimant was capable of performing her past relevant work as a vocational rehabilitation counselor. (Tr. at 25, Finding No. 6) Finally, the ALJ determined Claimant had not been under a disability since December 16, 2015 through September 30, 2016. (Id., Finding No. 7)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that that the ALJ erred in several respects: (1) that he failed to pose a hypothetical question that included her required accommodations such as elevating her feet, using a special chair, and no overhead reaching; (2) that he failed to consider Claimant's pain and perform a proper credibility determination; (3) that the ALJ failed to consider the combination of Claimant's impairments which precluded Claimant from performing substantial gainful activity; and (4) that the ALJ "failed in his duty to produce evidence sufficient to rebut the presumption of disability." (ECF No. 17 at 7-11) Claimant requests this Court reverse the final decision for an award of benefits or to remand to correct these errors. (Id. at 11)

In response, the Commissioner asserts that Claimant carried the burden of proving disability, and failed to do so. (ECF No. 18 at 6-8) Additionally, the Commissioner contends that the ALJ considered all Claimant's impairments, including the non-severe ones, both alone and in combination and accounted for them in a comprehensive RFC finding. (Id. at 8-12) The Commissioner argues that the ALJ also properly considered Claimant's subjective complaints against the objective medical record, and although they resulted in functional limitations, they did

not prevent her from performing her past relevant work. (Id. at 12-14) The Commissioner points

out that although Claimant does not challenge the RFC finding, the ALJ accommodated Claimant's

established functional limitations in his hypothetical to the vocational expert and was permitted to

rely upon the vocational expert's opinion concerning same. (Id. at 14-16) Finally, the

Commissioner contends that substantial evidence supported the ALJ's decision and asks this Court

to affirm. (Id. at 16)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record pertaining to Claimant's arguments

and discusses it below.

The Medical Evidence Related to Severe Impairments:

In 1970, when Claimant was 19 years old, she injured her right lower extremity in a motor

vehicle accident ("MVA"); she received a rod in her femur (Tr. at 397, 498). She also reported hip,

ankle, and shoulder injuries stemming from additional MVAs thereafter (Tr. at 46, 50). In 2012,

prior to the period of alleged disability, Claimant had a right total knee replacement (Tr. at 397,

420). Just weeks after her surgery, she reported feeling "fantastic" (Tr. at 397, 411, 420, 426, 450).

Thereafter, Claimant continued to do well: she reported doing things that she had not done since

she was 19, such as going up and down stairs and zip lining (Id.). She had 5/5 strength in her upper

and lower extremities with full range of motion and intact sensation (Id.).

In February 2015, Claimant presented for follow-up concerning her right ankle pain (Tr. at

377-379) She reported she had "done great over the years with the intermittent corticosteroid

injections", but her primary care provider recommended she come off steroidal medications for

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

the time being. (Tr. at 378) She wore a brace which she reported did not help. (Id.) An examination revealed tenderness in the area of the sinus tarsi and slight deformities consistent with tibial malunion with subtalar arthritis. (Id.) The plan was to have her wear a new stabilizing brace she liked in the office. (Id.) She followed up again in October 2015 reporting continued joint pain, for which "she takes willow bark for it and it helps a lot." (Tr. at 518) She reported doing therapy for her joints and staying active; she reported "[s]he cannot wait" to retire in December and has ordered exercise videos from the arthritis foundation and has plans to walk daily. (Id.) She had been treating with Dr. Shepherd for allergy testing and feeling better because she was not exposing herself daily to allergens. (Id.) She reported doing well on a paleo diet and reduced her cholesterol from over 200 to 140. (Id.) She saw Dr. Alkhankan for lung disease and using Singulair and Symbicort, but had not noticed a difference in her breathing, but she will give it a little more time. (Tr. at 519) The plan was to continue the paleo diet, exercise and follow up with Dr. Alkhankan for asthma in six months or sooner, if needed. (Tr. at 523)

In January 2016, during the period of alleged disability, Claimant had a three-year follow-up appointment with her surgeon and reported that "her right knee is doing well and [she] denie[d] any complaints or issues" (Tr. at 374). She had full and painless range of motion in her bilateral upper and lower extremities; straight leg raise tests were negative; she had full (5/5) strength in the bilateral upper and lower extremities; and her sensation was intact (Id.). An x-ray showed her knee replacement had good position and alignment with no signs of fracture or loosening(Tr. at 376). She was told to follow-up again in two years (Tr. at 374).

In March 2016, Claimant reported a "new problem" of left foot pain that she "did not feel[] was that bad. She just wanted to have it checked" (Tr. at 371). On examination, Shumaker's foot

was generally normal with only mild pain (Tr. at 371-372). X-ray testing revealed evidence of a previous bunionectomy; however, no fracture was seen (Tr. at 373). The impression was tibialis anterior tendinitis of the left side and distal tibial procurvatum and varus malunion with subtalar arthritis on the right (Tr. at 372). Claimant told the provider that her right foot was doing fine but that she wanted a new ankle brace as the current one helped her "quite a bit" (Tr. at 371). She was going to try a semirigid orthotic for more support for her left foot (Id.). Thereafter, Claimant did not make significant complaints related to ankle or foot pain during the period of alleged disability.

During an examination in December 2016, Claimant had a normal gait with no physical complaints (Tr. at 558-559).

In April 2017 (approximately seven months after Claimant's DLI), she sought treatment for her shoulder for the first time in two years and reported pain in her bilateral shoulders (Tr. at 368, 569, 721). On examination, she had "full range of motion in her shoulders without much pain" (Tr. at 368). She was tender to palpation and had some weakness in her neck, but she had good strength in her biceps and triceps, good grip, and intact sensation (Tr. at 369). She was given a prescription for physical therapy to assist with cervical strength (Tr. at 369-370).

The Medical Evidence Related to Non-Severe Impairments:

Claimant had a history of asthma and food allergies that were "well-controlled" "despite being off controller medication" (Tr. at 323). Prior to the period of alleged disability, in February 2015, she reported occasional fatigue due to her asthma and food allergies; she felt that her symptoms were not goingaway even though she ate healthy and exercised (Tr. at 301). In January 2016, Claimant reported going to Urgent Care for her asthma problems and was given another inhaler that did not work so she went back on to Advair. (Tr. at 531) Claimant reported that since

December, she had a bad cough and her lungs were filled with mucus – she was unable to get her breath very well, but reported feeling much better. (Id.) Chest x-rays were taken which indicated clear lungs (Tr. at 535-536). She was started on Proventil (Tr. at 532) She returned in February 2016 and reported her breathing was better, but unable to stay asleep due to the Proventil (Tr. at 537); she was assessed with asthma and drug induced insomnia (Tr. at 541).

In April 2016, during the period of alleged disability, Claimant had a check-up with physician Cari Burck, D.O., and reported that she "accidentally discovered she is allergic to eggs" (Tr. at 545). She stated that she stopped eating eggs for two weeks and "realized she was breathing well, not wheezing, her nose was not running, she felt better!" (Id.). She reported that when she ate eggs again, her symptoms came back, so she resolved to stop eating eggs (Id.). She also reported sleeping better due to retirement/reduced stress and reduced allergens. (Id.) She was "enjoying retirement and ha[d] some trips scheduled and [was] getting in the sun 30 minutes or so a day" to increase her vitamin D (Id.).

In August 2016 and December 2016, Claimant reiterated that she "hasn't had any further issues since [she] stopped eating eggs" (Tr. at 314, 555). She was "sleeping well;" her allergy symptoms were "controlled;" and her asthma was stable except in extreme weather (Tr. at 314, 317). She had normal physical examinations (Tr. at 317, 558-559). She "continue[d] to exercise" and was working as a simulated patient for a medical school and "love[d]" it (Tr. at 555).

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that she quit working because she "couldn't stand it": the stress "was killing" her; her "bones were hurting"; her "knee was hurting"; and because of "[c]hronic fatigue."

(Tr. at 41) She explained that after her knee replacement, in the last two years of her employment, she did not go out into the field as she had before, and mostly worked at her desk. (Tr. at 41, 44) She stated that while she "had the leeway" to get up and walk around, she tried to not sit for more than an hour, and she had a cardboard box or even used a wastebasket turned upside down under her desk to put her feet up once in a while. (Tr. at 41-42, 55) Her work also accommodated her by not having her attend conferences anymore because of her food allergies. (Tr. at 56)

She testified that she is unable to work due to chronic fatigue; when she was working, she was provided a "specialized chair" in order for her feet to touch the floor and "the fact that my shoulders I have to have a chair - - I have to have somewhere to put my arms" (Tr. at 44). She testified that the special chair also eased the pain in her back (Tr. at 55) Claimant denied having to reach overhead on a daily basis because she had a "little old dinky file cabinet" right next to her. (Tr. at 61)

Claimant stated that her right knee, hip and ankle hurt all the time. (Tr. at 44-45) She also stated that her back, both shoulders, and neck hurt as well. (Tr. at 45) For treating these conditions, she was going to start physical therapy again and she used exercise bands. (Id.)

She indicated that her chronic fatigue was due to an autoimmune response from food allergies, but there was nothing that could be done for it. (Tr. at 45-46) Because of having allergies to "many things", she is unable to take anything for her pain, except use the TENS unit every once in a while, and use the exercise bands. (Tr. at 48) She explained she has to exercise in order to be able to walk, otherwise her knee will be "set back like it was before" her knee replacement. (Id.)

She testified that due to having so many breaks on her right side, she's shifted her weight to where her spine is curved. (Tr. at 49) She stated that she still can only sit for an hour before she

has to get up and walk for about 10 to 15 minutes. (Tr. at 50) She cannot stand for longer than 45 minutes before she has to sit down. (Tr. at 51)

Claimant stated she uses inhalers for her asthma and that heat, dust, dirt, cold and hot air aggravates it. (Tr. at 54) She stated she gets out of breath while walking. (Tr. at 55)

Vocational Expert ("VE") Testimony:

The impartial VE testified that Claimant's past relevant work as a vocational rehabilitation counselor is classified as sedentary and skilled, and sedentary as performed. (Tr. at 59) The ALJ asked the VE to assume a person of Claimant's age, education, and work experience who could perform sedentary work, and could stand and walk for up to four hours out of an eight-hour workday; could occasionally balance, stoop, kneel, crouch, and crawl; could occasionally reach overhead with the right upper extremity; could frequently reach in all other directions with the right upper extremity; must avoid frequent exposure to extreme cold, dust, odors, fumes, gases, and other pulmonary irritants, vibration, unprotected heights, and moving mechanical parts. (Tr. at 59-60) The VE responded that such a person could perform the position of a vocational rehabilitation counselor as Claimant performed it in the last two years of employment. (Tr. at 60)

The ALJ asked another hypothetical, where an individual could stand and walk two hours out of an eight-hour workday and could occasionally balance, stoop, can crouch, but could never kneel or crawl; could occasionally reach overhead bilaterally with the upper extremities; could frequently reach in all other directions bilaterally with the upper extremities; and with the same environmental restrictions – in response, the VE stated such an individual could perform the position of a vocational rehabilitation counselor as Claimant performed it in the last two years of employment. (Tr. at 60-62) Even assuming the individual could sit for up to one hour and would

need to stand and/or walk for up to fifteen minutes while remaining on task before returning to the sitting position, and could stand and/or walk for up to 45 minutes before needing to sit for up to 15 minutes while remaining on task before standing and/or walking, the VE opined the individual could still perform Claimant's past work, but not as she performed it. (Tr. at 62-63)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)).  Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

Claimant must show that she became disabled prior to the expiration of her insured status on September 30, 2016. The DIB program provides for payment of disability benefits to individuals who are "insured" by virtue of their contributions to the Social Security trust fund

through Social Security tax on their earnings. 20 C.F.R. §§ 404.110, 404.315. To be entitled to DIB in this case, Claimant bears the burden of showing that she became disabled prior to September 30, 2016, the date when her insured status expired for the purposes of DIB. See 42 U.S.C. § 423(a)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). A claimant who first satisfies the medical requirements for disability only after her date last insured will not be entitled to DIB benefits. 20 C.F.R. § 404.131(a). See also Jenkins v. Astrue, No. 3:10cv705, 2012 WL 3776370, at *3 n.6 (E.D. Va. Apr. 25, 2012) (citing Matullo v. Bowen, 926 F.2d 240, 246 (3d Cir. 1990)) (explaining that a worsened condition or a new impairment arising after the date last insured cannot be a basis for remand or an award of disability benefits). Therefore, the relevant period for purposes of DIB is just from December 16, 2015, the date of Claimant's alleged disability onset, to September 30, 2016 when her insured status expired (Tr. at 16, 18, 25-26).

**Analysis**

As an initial matter, Claimant has taken the position the ALJ "failed in his duty to produce evidence sufficient to rebut the presumption of disability." (ECF No. 17 at 10-11) However, no such presumption exists. Salmons v. Astrue, No. 3:09-cv-01268, 2011 WL 612866, at *16 (S.D.W. Va. Feb. 11, 2011) (Eifert, M.J.); see Preston v. Heckler, 769 F.2d 988, 990 n.* (4th Cir. 1985) ("The ultimate burden to prove disability lies on the claimant."). Claimant offers nothing in support of this argument. Accordingly, to the extent Claimant argues the ALJ had a duty to rebut the presumption of disability, this argument lacks merit.

The Combination of Impairments:

Claimant also contends that the ALJ failed to consider the combination of her impairments, but offers nothing in support of this contention (ECF No. 17 at 9-10). Although Claimant asserts

that the medical records indicated that she suffered from numerous impairments, she does not specify which impairment specifically meets or equals any Listing. As noted *supra*, Claimant bears the burden of proving she has an impairment or combination of impairments that meets or medically equals the severity of Listing requirements. See <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987).[3]

> The Regulations provide:
>
> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

See 20 C.F.R. § 404.1523(c). When confronted with a combination of impairments, an adjudicator must not only acknowledge "the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 398 (4th Cir. 1974). The Fourth Circuit has held that the ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. <u>Id</u>. In short, the ALJ must analyze the cumulative or synergistic effect that the various impairments have on Claimant's ability to work. <u>DeLoatche v. Heckler</u>, 715 F.2d 148, 150 (4th Cir. 1983).

---

[3] The Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

"The Listing of Impairments . . . describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." See 20 C.F.R. § 404.1525(a); Sullivan v. Zebley, 493 U.S. 521, 532 (1990). To qualify for benefits, Claimant must show that her combination of impairments is "equivalent" to a listed impairment, and she "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." See Id. at 531. Claimant must meet all, not just some, of the criteria for a listing to apply. Id. at 530.

Earlier in the written decision, at the second step in the sequential evaluation process, the ALJ acknowledged Claimant's high cholesterol, vitamin D deficiency, hypothyroidism, multiple allergies, breathing problems, and obesity. (Tr. at 18) Significantly, the ALJ noted that the record showed Claimant sought treatment for asthma, contact dermatitis, chronic rhinitis, a "leaky gut" and overstimulated immune system prior to the amended onset date, however, medical records showed these conditions were controlled via medication, or she only experienced symptoms during the spring, or her symptoms had resolved by not eating foods that triggered an allergic reaction. (Tr. at 19) For instance, in January 2016, treatment notes indicated that although Claimant complained of shortness of breath, her chest x-ray was clear, and after her medications were adjusted, she reported "her allergies and breathing had improved since she stopped eating eggs." (Tr. at 19, 535, 541, 545).[4] The ALJ also referenced an August 2016 medical record concerning Claimant's breathing issues, including a recent diagnosis of sleep-related hypoxia, wherein Claimant again reported her breathing issues had improved after she stopped eating eggs and that she observed that multiple foods and cleaning products worsened her breathing issues, but if she

---

[4] The ALJ specifically referred to the January 2016 chest x-ray, and treatment records dated February 2, 2016 and April 18, 2016/

avoided them, she was "okay." (Tr. at 19, 314) It was noted further that Claimant reported "she only had breathing issues if she became overheated. (Id.) The ALJ noted that "[t]he overall assessment was vasomotor rhinitis; allergic contact dermatitis that was better controlled; and chronic conjunctivitis but with non-adherence to medical treatment;" and that Claimant "was reluctant to take asthma medications as prescribed." (Tr. at 19, 317) Ultimately, the ALJ determined that with respect to all these conditions, because they are controlled or ceased with medication management or avoidance of triggers, and mentioned in the record just from time to time, these impairments are non-severe, as they do not cause significant limitations in functioning or did not last for a continuous twelve-month period. (Tr. at 19) Nevertheless, the ALJ explicitly stated that such impairments were taken into account in assessing Claimant's RFC. (Id.)

As noted *supra*, at the third step in the sequential evaluation process, the ALJ explicitly found that none of Claimant's impairments, singly or in combination, met any of the Listings' requirements. (Tr. at 20) Absent any evidence to the contrary, a reviewing court must take the ALJ's findings at his word. See Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014). Indeed, this Court has previously determined that an ALJ properly considers impairments in combination where she discusses each impairment separately and finds that the claimant's impairments, when considered together, did not prevent him from performing basic work activities. See, e.g., Wiseman v. Colvin, 2015 WL 9075457, at *19 (S.D.W. Va. Nov. 24, 2015), *report and recommendation adopted by*, 2015 WL 9008899 (S.D.W. Va. Dec. 15, 2015).

With regard to her severe physical impairments, the ALJ evaluated same under Listing 1.04 and noted there was no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal

stenosis resulting in pseudoclaudication (Tr. at 20, 371, 373, 387).[5] The ALJ further considered Claimant's severe impairments under Listing 1.03, which concerns reconstructive surgery or surgical arthrodesis of a major weight bearing joint, that the evidence did not meet Listing requirements because there was no indication Claimant was unable to ambulate effectively (Tr. at 20, 371, 373). The ALJ noted that there was no record of Claimant's treating or examining physicians having "mentioned findings equivalent in severity to the criteria of any listed impairment." (Tr. at 20)

In the assessment for Claimant's RFC, the ALJ again explicitly reviewed the medical evidence in addition to Claimant's allegations concerning her musculoskeletal injuries, which included several procedures and treatments over the years prior to the amended alleged onset date. (Tr. at 21-25) Accordingly, to the extent Claimant argues that her impairments, singly or combined, met Listing requirements, the undersigned **FINDS** that argument lacks merit, the undersigned further **FINDS** that the ALJ's step three determination is supported by the substantial evidence.

<u>Evaluation of Symptoms in Disability Claims:</u>

Claimant has argued in a conclusive fashion that the ALJ "disregarded" and "failed to properly consider" the record as it related to Claimant's pain, as well as failed to perform a "credibility determination" (ECF No. 17 at 9).

---

[5] The ALJ referenced treatment records from Marshall Health dated March 2, 2016 that concerned Claimant's right and left ankles and an x-ray of her left foot that did not show any fracture or arthritic changes, as well as a physical therapy initial evaluation report dated December 3, 2014 concerning Claimant's right shoulder.

Social Security Ruling ("SSR") 16-3p[6] clarifies the evaluation of symptoms, including pain: 20 C.F.R. § 404.1529 requires a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can reasonably be accepted as consistent with the objective medical evidence and other evidence; that explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs that adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. See, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to

---

[6] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p and therefore governed the ALJ's decision herein. See, SSR 16-3p, 2016 WL 1131509. The new Ruling eliminates the use of the term "credibility" from SSA policy because the Regulations do not use that term: "we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." See, 2016 WL 1119029, at *1.

work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. § 404.1529(c)(4). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons . . . Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

Id. § 404.1529(c)(3).

Contrary to Claimant's argument, even a cursory review of the written decision shows that the ALJ considered her complaints of pain, as well as his medication and other treatment modalities for her pain. (Tr. at 21-24) From the onset, the ALJ noted, "[s]econdary to her combined conditions, the claimant said she has trouble reaching, lifting, climbing steps, and standing over 45 minutes. She said she is weak and as a result, she has fallen." (Tr. at 21) When determining the appropriate RFC, the ALJ recognized that Claimant had suffered significant injury to her right lower extremity in the 1970's due to MVA, and that over the years, she suffered additional

musculoskeletal injuries due to additional accidents. (Id.) For instance, the ALJ noted that many years prior to the amended onset date, Claimant underwent several treatments for her injuries, which included injections, medications, and wearing a brace, but when it was determined that conservative treatments failed, she finally underwent a total right knee arthroplasty (TKA) in November 2012. (Tr. at 21, 500, 498, 497, 495, 490, 479, 464, 463, 452) The ALJ further noted that following the TKA, the evidence showed that the procedure and a subsequent manipulation of her knee under anesthesia provided Claimant with greater motion in her knee than "ever" before the surgery and that she reported feeling "fantastic" and was "overall doing well with no complaints" in the years prior to the amended alleged onset date (Tr. at 21-22, 452, 436, 451, 426, 420, 411, 407, 496, 274, 403, 400, 437, 959, 519, 395, 434, 432, 427, 422, 378). Despite the good results from her TKA, the ALJ recognized that during the years preceding the amended alleged onset date, Claimant had made intermittent complaints with respect to her right lower extremity, including stiffness and/or pain in her right knee, right ankle pain, and right foot pain (Tr. at 22-23, 436, 451, 795, 407, 496, 400, 959, 395, 378) To manage these conditions, the ALJ noted that Claimant received injections, physical therapy, and braces (Id.), which Claimant reported to be beneficial, including at one time in April 2013 that she no longer needed to take pain medications. (Tr. at 22, 274)

In addition to her symptoms related to her complaints of pain related to her lower extremities, the ALJ noted prior to the amended alleged onset date, Claimant had also complained of pain in her left and right shoulders (Tr. at 22-23, 959, 434, 432) He noted that Claimant had complained to John Lasko, M.D., "of shoulder pain for the past few months that increased with reaching up, overhead, and across her body", resulting in an x-ray impression of "right shoulder

acromioclavicular joint arthrosis and osteophytosis with trapezius spasms and scapular dyskinesia." (Tr. at 23, 434, 432) After a four-week course of physical therapy was advised, the ALJ further noted that during an examination in January 2015, Claimant had full range of motion of her bilateral upper (as well as lower) extremities; it was reported that Claimant was doing well overall with no complaints and to return in one year. (Tr. at 23, 427, 422)

Fewer medical records documented Claimant's complaints during the relevant period, however, the ALJ noted that a January 2016 x-ray revealed she was status post TKA on the right side with good position and alignment with no signs of fracture or loosening (Tr. at 23, 376) and that Claimant was going well with no complaints and to return in two years (Tr. at 23, 374). The ALJ also noted that in March 2016, Claimant had new complaints of left foot pain, for which she was prescribed a brace; it was also reported that Claimant "told the provider that her right foot was doing fine but that she wanted a new ankle brace as the current one helped her 'quite a bit.' " (Tr. at 23, 373, 371) In April 2016, a record noted Claimant was received treatment for ankle joint and left foot pain (Tr. at 23, 550).

Next, the ALJ performed the requisite credibility/consistency analysis endorsed by <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1995). (Tr. at 23-24) Following his review of the objective medical evidence of record as well as Claimant's subjective complaints of pain, the ALJ determined that "claimant's statements about the intensity, persistence, and limiting effects of her symptoms [  ] are  inconsistent because the weight of the evidence does not support them." (<u>Id</u>.) The ALJ then reviewed the medical evidence of record, *supra*, highlighting the aspects that undercut her allegations of totally disabling pain. (Tr. at 24-25) While the ALJ acknowledged Claimant had significant musculoskeletal problems for many years, and that the medical records

supported same, the ALJ also gave considerable attention to the statements Claimant made regarding her subjective symptoms after her knee surgery: "she was doing things she had not done in years"; "she was now climbing steps, which she had not been able to do since age 19"; "she had recently gone zip lining"; and "[she] reported wearing a brace on her feet eased her foot symptoms" (Tr. at 24, 372, 437). The ALJ noted that although Claimant stated she became unable to work as a result of her combined conditions, "she told Dr. Kurucz in January 2015 that she planned to retire from work in 10 months" and "[s]everal months later, she told Dr. Burck she was going to retire in December 2015 and that she could not wait to do so as she planned to walk daily and she had already ordered exercise tapes" (Tr. at 24, 301, 518).[7] It was also noted that during an office visit in April 2016, Claimant reported enjoying retirement and had some trips planned (Tr. at 24, 545) and that even just a few months after her DLI expired, she told Dr. Burck "that she was 'loving retirement' . . . [and] since she stopped eating eggs that many of her symptoms disappeared." (Tr. at 24, 555) Additionally, the ALJ noted that Claimant also reported enjoying working a casual job as a "simulated patient" and loved it and that she continued to exercise (Id.) Ultimately, the ALJ determined that with respect to Claimant's statements concerning her impairments and their impact on her ability to work, they were inconsistent with her activities of daily living, the clinical findings, and course of treatment during the relevant period, from December 16, 2015 through September 30, 2016. (Tr. at 24)

In Hines v. Barnhart, the Fourth Circuit stated that:

Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and

---

[7] The medical record from January 2015 noted that Claimant was complaining of job-related stress. (Tr. at 301)

the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing Craig v. Chater, 76 F.3d at 595).

Recently, the Fourth Circuit emphasized the adjudicator's role in evaluating subjective symptoms: "an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." See Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir. 2020) (internal citations omitted). The Fourth Circuit "reiterate[d] the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms." Id. It is important to recognize that in Arakas, the Court concluded that substantial evidence did not support the ALJ's finding that the claimant's subjective complaints were inconsistent with her daily activities because the overall record actually supported her subjective complaints and demonstrated she would be unable to engage in substantial gainful activity. Id. Another significant, if not critical, aspect of the Arakas holding is that the Court found the ALJ's analysis included misrepresentations or overinflation of the claimant's abilities, to the exclusion of that evidence which did not support such a conclusion. Id. For purposes herein, this Court must determine if the subject ALJ's analysis relied primarily on the lack of objective medical evidence as the reason for discounting Claimant's complaints.

The foregoing demonstrates that the ALJ in this case did not overinflate Claimant's capabilities while ignoring the evidence tending to support his allegations of functional limitations; the ALJ herein did not make factual misrepresentations or misinterpretations of the evidence of record in order to make a nondisability finding. Indeed, given the conflicting evidence consisting of Claimant's allegations of pain and other symptoms with the objective and other evidence of

record, the ALJ is solely responsible for resolving the conflict; the issue before the Court is not whether Claimant is disabled, but whether the ALJ's finding is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Craig v. Chater, 76 F.3d at 589. In this case, it appears that the ALJ paid close attention to the objective medical evidence from the relevant period, which included Claimant's then reports concerning her pain symptoms or lack thereof as well as what helped her pain and what did not relieve her pain, and compared it to Claimant's current allegations of pain. In short, the ALJ's discussion involved a thorough review of the conflicting medical and other evidence requiring some reconciliation.

Accordingly, the undersigned **FINDS** that Claimant's arguments that the ALJ disregarded the record concerning Claimant's pain and failed to evaluate her symptoms against the evidence of record lack merit, the undersigned further **FINDS** that the ALJ's assessment of Claimant's subjective complaints is supported by the substantial evidence.

The RFC Assessment and Hypothetical Questions to the Vocational Expert:

Claimant also argues that the ALJ erred by failing to include the required accommodations that allowed her to continue in her employment during the last two years in the hypotheticals posed to the vocational expert. (ECF No. 17 at 8-9) Claimant specifies that the hypotheticals did not include any reference to elevating her feet, using a special chair, or no overhead reaching. (Id. at 8; citing Tr. at 44, 55, 61)

A claimant's RFC represents the *most* that the individual can do despite his limitations or restrictions. See SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the

basis for determining the particular types of work a claimant may be able to do despite her impairments. 20 C.F.R. § 404.1545(a). The RFC determination is an issue reserved to the Commissioner. Id. § 404.1546(c).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted); see also Felton-Miller v. Astrue, 459 F. App'x 226, 231 (4th Cir. 2011).

To the extent that Claimant is arguing that the RFC assessment is not supported by substantial evidence, this Circuit has recognized that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam)). Instead, an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). In this case, while the ALJ did not explicitly refer to the accommodations provided for Claimant during the last two years of her employment, specifically, elevating her feet under her desk, using a special chair that allows her to put her feet on the floor, or avoiding overhead reaching, as observed by the Commissioner (ECF No. 18 at 15), it is noted that none of these accommodations are documented in the objective medical record and none of Claimant's treating physicians made any notation in their treatment records that Claimant required such accommodations. However, the ALJ did accommodate Claimant's credibly-established limitations resulting from her impairments in the hypotheticals to the vocational expert by

restricting her to only occasional reaching overhead with the right upper extremity and to only stand and/or walk four hours during an eight hour workday, *supra*. (Tr. at 20) In addition to being persuaded by Claimant's good results from her knee replacement surgery, the stable examination findings that followed over the course of many years since, as well as her continuation with her exercises, the ALJ was also persuaded by the state agency medical consultants, both of whom opined Claimant was capable of performing her past relevant sedentary work despite her impairments during the relevant period (Tr. at 24, 68-78, 80-90) There are no physicians of record who have found greater functional limitations, save Claimant's own unsupported allegations.

In light of Claimant's argument that the ALJ posed an incomplete hypothetical to the vocational expert, it is noted that this Circuit has long since held that hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As stated above, the reconciliation of conflicting evidence was for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7. Accordingly, the undersigned **FINDS** that the vocational expert's responses to the ALJ's controlling hypothetical question(s) were supported by substantial evidence.

Although Claimant advocates for an alternate decision, such are matters that involve resolving the conflicting evidence of record, which is an evidentiary finding within the purview of the ALJ. In short, though Claimant may disagree with the ALJ's determination that she could perform her past relevant work as a vocational rehabilitation counselor during the relevant nine-month period, this Court cannot re-weigh this conflicting evidence or substitute its judgment for the Commissioner's. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also, SSR 96-8p, 1996 WL 3741784, at *7.

In short, the ALJ's narrative of the record included the objective medical evidence, such as imaging and examination findings, as well as the other evidence of record, including Claimant's own statements and testimony; the ALJ's thorough discussion of all this evidence, and his ultimate determination that Claimant remained capable of performing her past relevant work during the relevant period provided sufficient explanation allowing for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at his conclusions" therefore remand is not necessary. Mascio, 780 F.3d at 637. Accordingly, the undersigned **FINDS** that the ALJ's RFC assessment as well as the controlling hypothetical questions to the vocational expert were based upon substantial evidence.

Finally, the undersigned further **FINDS** that the ALJ's analysis of the evidence of record, and the final decision denying Claimant's applications for benefits are also supported by the substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand (ECF No. 17), **GRANT** the Defendant's request to affirm the decision below (ECF No. 18), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of

27

objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: March 8, 2021.



Omar J. Aboulhosn
United States Magistrate Judge